West Chicago St. R. R. Co. v. Johnson.

## West Chicago St. R. R. Co. v. Clara Johnson.

1. Verdicts—*Reached Under Improper Influences.*—A verdict reached under improper influences is not likely to command respect by the public or a restful submission by one against whom it is directed.

2. Same—*Excessive—When Not Cured by a Remittitur.*—An excessive

verdict, which is the result of passion and prejudice on the part of the jury, is not cured by a remittitur entered for the purpose of preventing the allowance of a motion for a new trial.

3. TRIALS—*Conduct of.*—A proceeding under the law to enforce a right or redress a wrong, having as its result the taking from one man of his property and giving it to another, is always a matter requiring the most solemn and deliberate consideration by the tribunal entrusted with such duty and responsibility.

Trespass on the Case, for personal injuries.—Appeal from the Circuit Court of Cook County; the Hon. EDMUND W. BURKE, Judge, presiding. Heard in this court at the October term, 1896. Reversed and remanded. Opinion filed March 8, 1897.

EGBERT JAMIESON and JOHN A. ROSE, attorneys for appellant.

ELA, GROVER & GRAVES, attorneys for appellee.

MR. PRESIDING JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The appellee recovered a verdict of $20,000 for personal injuries sustained by her through the alleged negligence of the appellant, and, one-half the amount thereof being remitted, judgment for $10,000 was entered, and this appeal has followed.

The appellee was a passenger on one of appellant's grip-cars, and sat on the front seat next to the dash-board. The train, consisting of the grip-car and two trailers, came from the west on Madison street, and was destined to pass into State street upon the curved tracks at the intersection of such streets, and proceed northward along the tracks of the appellant located in the west half of State street.

At that time the many-storied building on the northwest corner of State and Madison streets was in process of construction, and the materials therefor were being delivered into the structure by means of wagons, which entered from State street through an archway or opening ten or twelve feet wide, located twenty or thirty feet north of Madison street. In order to make the entrance teams had to pull

up an incline of about a foot, made of planks that covered the sidewalk, and which, presumably, began at about the curb line dividing the roadway from the sidewalk, and extended into the building. The radius of the curved tracks is not made to appear, but we infer that the curve, in the State street end of it, terminated about in front of the entrance into the building.

A large wagon loaded with tile to be used in the building had been standing upon the east side of State street, directly in front of the building, for about half an hour, waiting to be admitted to the building, and the driver being signaled to drive in, drove across the street at nearly right angles, and the hind wheel on the south side of his wagon was struck, and the wagon stopped and shoved, by the grip-car in question as it came round the curve. The wagon load weighed about sixty-five hundred pounds, and the tiles sloped upward from the wings of the sideboards of the wagon. When the collision occurred, some of the tiles were thrown off and a few of them landed in the front of the car where appellee was sitting, and she was struck by one or more of them and received the alleged injuries. The tiles weighed, when dry, about twenty pounds, and when wet about thirty pounds apiece, and one of them lodged and was found in appellee's lap.

Appellant has argued only four of the assigned errors, viz.: That the verdict was contrary to the evidence; the excessiveness of the damages; improper conduct of counsel for appellee; and the admission of incompetent evidence.

The appellee was a passenger and there is nothing to show that she was in any manner guilty of contributory negligence. She sat in her place by invitation of the appellant, and was entitled to the protection and safe carriage which the law gives to one so situated. Whether she suffered serious injury was one of the chief contentions at the trial, as it is here. The trial judge seems to have considered that matter, and perhaps also to have taken into account other elements which entered into the trial and are shown by the record, and to have required the appellee to remit one-half

of the verdict as a condition to giving judgment for the other half.

Upon a careful consideration of all the evidence, we do not find fault with the conclusion reached by the jury that the appellant was guilty of negligence, and that such negligence resulted in injury to the appellee.

Witnesses testified that the length of the wagon from the front end of the pole to the rear end of the wagon was from twenty to twenty-five feet.

When the collision took place, all of the wagon, except the furthest half of the hind wheels, was across the track. The gripman testified that he saw the team when it entered upon the track, and the evidence showed it was moving slowly, as it naturally would.

The wagon had an equal right with the cable train upon the street, and it was a mere question of fact whether or not it was negligence to so operate the train as to be unable to stop it in time to avoid the collision. It would seem that the exercise of reasonable and ordinary care in the operation of a cable train at such a crowded point as the place of the accident, would require it to be kept down to a rate of speed which would permit it to be stopped within the time that a slowly traveling team and wagon, twenty or twenty-five feet long, would reasonably require to pass over the tracks. The gripman saw the horses as they entered upon his track, and the team had to travel at least twenty feet before the hind wheel of the wagon could be struck by the grip-car. Under such circumstances, no nice measurement of chances should be taken by the operator of a train; and it was purely a question of fact for the jury to determine whether it was, or not, negligence for the train not to have been brought to a stand-still in time for the wagon to clear itself from the tracks.

But, coming to consider the question of the amount of the damages in connection with the means employed to produce them, we are confronted with a record which, in such respect, is remarkable, and, happily, not frequent.

It would seem that the trial judge, by requiring a remit-

West Chicago St. R. R. Co. v. Johnson.

titur of one-half the verdict, must have thought it was wrong to that extent, and while from a review of the evidence, we think he was clearly right in condemning the verdict to the extent that he did, we must look further to determine whether he should not have set it aside altogether.

When a verdict for twenty thousand dollars in a personal injury case be tainted by something which vitiates it to one-half its extent, it is a serious question if its other half may be ripened into a wholesome judgment—whether the vice that contaminated it to the extent of one-half did not permeate and invalidate the whole.

Certainly we, justifying the remittitur that was made, owe a duty to examine with great care the entire record upon which such action was based, in order to ascertain whether a verdict which was so bad in part should be sustained as to the rest of it.

A proceeding under the law to enforce a right, or give redress for a wrong, having as its result the taking from one man his money or property and conferring it upon another, is always a matter requiring the most solemn and deliberate consideration by the tribunal entrusted with such duty and responsibility.

The purpose, in part, for which courts are established, is that justice shall be administered, not alone with impartiality, but in an orderly manner, and whatever tends to thwart such an administration of justice operates to deprive a party to the suit of his right to "due process of law." One may not say that his property shall not be taken from him and bestowed upon another to satisfy a legal demand, but he may say it shall not be done except by "due process of law," and a fair trial by jury of the truth of alleged facts, upon the establishment of which depends the right to take his property from him, lies at the very foundation of the power of the law to divest him of his otherwise unquestioned right to keep what is his own.

Keeping such propositions in view, and having the record before us, it is impossible for us to say that the trial was such as the law contemplates should be had.

Nearly forty pages of the abstract are occupied by what are claimed to be objectionable and improper remarks and statements made by counsel for appellee in his closing address to the jury, and more than a hundred objections and exceptions thereto by appellant's counsel.

Interspersed among those pages are six notations of "laughter in the court room," "laughter," "laughter from the audience," "laughter," "laughter by the audience," and "applause by the bystanders," provoked by the wit or vituperation of appellee's counsel.

Against such conduct by the audience the counsel for appellant objected and protested.

We reproduce from the abstract the proceedings concerning the last two of such interruptions by the audience.

Immediately following the notation of an exception to the last preceding remark of appellee's counsel, the following appears :

"Judge Wing : He takes his exceptions a little more quietly than he used to. He is improving. Maybe he is losing his health. (Laughter by the audience.) Now, gentlemen of the—

Mr. Mason : I take an exception to the conduct of the bystanders, and the audience in the court room applauding the statement of Judge Wing.

Judge Wing : Finding fault—

Mr. Mason : I except.

The Court : Let's have one at a time, gentlemen.

Judge Wing : Finding fault with the audience as well as myself.

Mr. Mason : I want to enter my exception not only to the conduct of counsel, but of the bystanders.

Judge Wing : He finds fault with us for not suing the driver of the wagon; he finds fault with us for not suing the owner of the wagon; he finds fault with us for suing the cable car company; he finds fault with us for suing anybody at all; he finds fault with us for the way we try our case; he finds fault with our witnesses who come into court; he finds fault with the people who casually drop in here

West Chicago St. R. R. Co. v. Johnson.

to hear the trial, and I hope to God he will find fault with your verdict when it comes in. (Applause by the bystanders.)

Mr. Mason: I object, your honor, and take an exception."

And without any ruling by the court, counsel for appellee proceeded in his argument.

We shall refer, in detail, but to one more of the many occurrences in the course of the argument that is complained of. Many of the objections that were interposed were not well taken, although some were. Whether well made or not, the only apparent attention given to them by the court was an admonition to the counsel who was speaking, to confine himself to the record. We quote from the abstract:

"Judge Wing: I must bless that kind providence, because I know, and can appreciate, the keenness of her suffering if she could know of this disgraceful perjury that they have presented against her here of former abortions, and miscarriages without number, and lies unspeakable and unbelieved. A Catholic woman does not commit abortion.

Mr. Mason: Exception.

Judge Wing: Gentlemen of the jury—

Mr. Mason: Exception. I want to be heard and shall be heard.

Judge Wing: And I want to be heard all over Chicago.

The Court: Mr. Mason.

Mr. Mason: There is no evidence that this plaintiff is a Catholic woman, and I want to be heard upon this point.

Judge Wing: There is evidence that she is a Catholic woman.

Mr. Mason: I don't propose to be put in a position where I can not save my record in this case. There is not one vestige of evidence that the plaintiff in this case was a Catholic woman, and it would not have been proper to have even offered it, and it is not proper for you to state it.

Judge Wing: If it isn't here in the record I am willing to sit down. I can find it.

The Court: You must stand by your record.

Judge Wing (reading): 'Question.' Let me tell you how it happened; Mr. Furthman was standing right here and he said to me: 'Will you admit that this young man sitting here is F. E. Johnson?' and I said: 'Fred, you were married by a priest all right?' and Fred said 'Yes.'"

A consideration of the whole argument, and the frequent jangling and quarreling of counsel concerning its propriety and truthfulness as applied to the facts of the case, and the disorder above referred to, deprived the trial of many characteristics which should always accompany a calm and deliberate attempt to arrive at an end which justice would approve of. To sustain such proceedings is to encourage them.

It seems to be true, as urged by appellee, that numerous of the objections interposed by appellant's counsel were not pressed upon the attention of the trial judge, and his rulings obtained thereon so as to form the basis of a legal exception but we are considering the question not wholly with reference to technical legal errors, but largely in the broader aspect of what amounts to an orderly and deliberate trial of the rights of one party as against the other.

To demand respectful and orderly submission to the law, it is but little less important that justice should have the semblance of being fair and impartial, than that it should be so in fact.

A verdict reached under improper influences is not likely to command respect by the public or a restful submission by one against whom it is directed.

The veriest criminal should not be subjected to the adverse result of an unfair trial, nor may the party to a civil suit be mulcted in damages under improper influences. We counsel and judges, whose pride in the law consists largely in the sense that it is duly administered, should be ever watchful of the dignity and majesty of its proceedings.

The question then recurs, if the verdict returned under such circumstances was bad to the extent of one-half, as it appears to have been in the opinion of the trial judge, should it be sustained as to the other half?

Our Supreme Court has spoken twice, at least, in very pertinent language about similar verdicts.

In Illinois Central R. R. Co. v. Ebert, 74 Ill. 399, which was a case of personal injury to a teamster whose team was killed and himself seriously crippled, disabling him from performing the labor to which he was accustomed, Mr. Justice Breese, in delivering the opinion of the court, said :

" The accident, then, having been occasioned by the negligence of the company, they must bear the consequences ; they must respond in damages. Were the damages properly assessed in the case ? Do the facts justify a finding so heavy ? Ten thousand dollars is a very large sum of money, in the possession of which very few can boast. It is a small fortune, which few acquire in a life of incessant labor. This the jury awarded to one whose prospects in life did not extend beyond his wages as a day laborer, and who has not been, by the negligence of the defendants, wholly disabled. It is true, the company were at fault, but not so greatly as to aggravate it to willfulness.

Compensatory damages were all the jury were justified in awarding, under the evidence. A verdict for $10,000 is so enormous as to justify the inference the jury were actuated by prejudice and passion, not listening to the dictates of cool judgment. The enormity of the finding so shocked the sense of justice of the plaintiff's counsel that they at once remitted more than one-half of the amount. (From $10,000 to $4,000.) We can not but think the verdict was the result of passion and prejudice, and it is none the less so after the remittitur, for the incentives to the finding abide as well in what remains as in the original amount found. The verdict was for $10,000. That verdict was the result of passion and prejudice. If those incentives prompted the verdict they vitiate the verdict, and it should have been set aside. But a practice has found place in our jurisprudence which sanctifies an outrageous verdict by entering a remittitur, and it has so often received the sanction of this court that it may be too late now to displace it." And the judgment for $4,000 was affirmed.

Again, in Loewenthal v. Streng, 90 Ill. 74, a case of malicious prosecution, where a verdict for $10,000 was remitted down to $6,000, similar comment was made. In speaking of the verdict, the court said:

"It could only have been induced by prejudice, passion, or a total misconception of the case. And when it is so flagrantly excessive as to be only accounted for on the grounds of prejudice, passion or misconception, the remittitur does not remove the prejudice, passion or misconception. These elements may have entered, and probably did enter, into the finding of other facts important to the issue, if not the issue itself. Such feelings would naturally lead to an unfair finding against appellant." And there the judgment was reversed.

In the case of C. & N. W. Ry. Co. v. Cummings, 20 Ill. App. 333, this court said:

"While it must be said that by the law, as settled, it is in the power of the trial court to render judgments on verdicts reduced, as the one under consideration was, to an amount satisfactory to the trial judge, and the entering of such judgment is not error, yet the judgment so rendered is anomalous, and, in a reviewing court, can not be entitled to the presumptions which obtain in favor of a judgment upon a fair verdict, which results from concurrence upon all the issues by the jury and the court. In the exercise of the revisory power of this court we may reverse a judgment rendered under such circumstances as appear in the record, notwithstanding there appear to be no errors of law, where in our opinion such course will best tend to promote the impartial administration of justice. In view of all the circumstances shown by the evidence in this record, and the impeachment of the verdict by the trial judge, in which appellee concurred by entering a remittitur of so large a part of the verdict, we conclude that the better and more prudent course, the one most likely to conserve the rights of both parties, and approximate justice most nearly in the end, is to submit the issues between the parties to the consideration of another jury, and, that this may be done, the judgment will be reversed and the case remanded."

That was the case of an assault and battery committed by a brakeman of that appellant upon a passenger. The verdict was for $2,000, from which $1,400 was remitted and judgment given for $600, and the judgment was reversed.

In a part of the opinion preceding the portion already quoted, the court said:

"The damages assessed by the jury were, according to the judgment of the court, more than three times greater than were justified. The damages were unliquidated, and there was no way in which the court could ascertain what part of the judgment (verdict) was for actual damages, and what for punitive damages. * * * A verdict * * * so excessive that seven-tenths of it will be remitted to prevent a new trial, can not but be regarded as the result of passion and prejudice on the part of the jury, and it is difficult to see how the vice in such a verdict can be cured by a remittitur, for the passion and prejudice was in the jury, and must have entered into and permeated the whole finding, and must abide in that which remains as well as in that which is remitted."

We can not improve upon the language or reasoning of those cases.

Finding in the record, as we do, so much evidence of what is prejudicial to a cool and deliberate verdict, we are of the opinion that the trial judge ought to have set the entire verdict aside, and our duty is to send the case back for another trial.

We are not to be understood as condemning the practice, many times, and under some circumstances, most commendable, of the trial judge requiring a remittitur where, upon a fair hearing, a jury may, in his opinion, have exceeded reason and sound judgment in estimating the compensatory damages that one who is injured by the negligence of another, is fairly entitled to.

In passing upon this case we have not been unmindful of the difficulties and embarrassments under which a trial judge labors under our system of practice, nor of the manner in which, with the introduction of stenographers, bills

of exceptions are nowadays made up and approved. But we are required by the law to judicially believe that bills of exceptions duly certified, speak the truth, however much we may, as individuals, question their entire accuracy.

Upon the record as it is, we can not approve this judgment, and it is accordingly reversed and the cause remanded.